AB:RJN
F.#

UNITED STATES DISTRICT COURT **10-1055**
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

ONE BLACK AND GRAY SPRINT
BLACKBERRY CELLULAR PHONE WITH
ESN NUMBER HEX4C740C55

- - - - - - - - - - - - - - - - X

AFFIDAVIT IN SUPPORT
OF A SEARCH WARRANT

T. 21, U.S.C., § 846

EASTERN DISTRICT OF NEW YORK, SS:

        JAMES G. LEE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, ("FBI"), duly appointed according to law and acting as such.

        Upon information and belief, there is probable cause to believe that there will be located within a black and gray Sprint cellular phone with ESN Number HEX4C740C55 (the "CELL PHONE"): text messages, names, telephone numbers, calendar entries, electronic serial numbers, international mobile subscriber numbers and other related information concerning a conspiracy to distribute more than 500 grams of cocaine, which may constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 846.

The source of my information and the grounds for my belief are as follows:[1]/

1.    I have been a Special Agent with the FBI for approximately 24 years, and I am assigned to the Organized Crime Division.  I have experience investigating matters involving narcotics trafficking, armed robbery, attempted robbery, and other violent crimes, racketeering activities, money laundering and other illegal activity.  I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my conversations with other law enforcement officers, including officers of the Suffolk County Police Department, my review of documents, and my own training and experience.

## THE CELL PHONE

2.    The CELL PHONE is currently in the custody of the FBI and, as set forth more fully below, was recovered from the defendant DREW CAMPBELL at the time of his arrest on August 30, 2010.

---

[1]    Because the sole purpose of this affidavit is to establish probable cause to search, I have not set forth a description of all the facts and circumstances of which I am aware with regard to the investigation.

## THE INVESTIGATION

3.    According to information provided by a Cooperating

Witness ("CW")[2/], the defendant, DREW CAMPBELL, told the CW that

he purchased one kilogram of cocaine in or about November 2008

from an individual known as "Marlo" for purposes of distribution

to other individuals.  CAMPBELL also told the CW that, in 2009,

he sold cocaine to an individual known as "Tray," to whom

CAMPBELL had been introduced by Robert Spatafora.

4.    In or about and between August 2009 and September

2009, law enforcement agents acting pursuant to a court-

authorized wiretap intercepted calls between Robert Spatafora and

the defendant.  Relevant portions of some of these calls are

excerpted below.  Based upon my training and experience, my

participation in this investigation and my conversations with

other law enforcement agents and witnesses, I believe that the

calls excerpted below concern cocaine trafficking.  The telephone

number used by CAMPBELL during these intercepted calls is the

---

[2]    The CW pled guilty pursuant to a cooperation agreement in
the Eastern District of New York to a felony drug charge.  The
CW's information has been corroborated by, among other things,
court-authorized wiretaps, physical surveillances, and statements
by other witnesses.  The CW is cooperating with the government in
the hope of obtaining leniency in sentencing.

3

same telephone number that belongs to the CELL PHONE seized upon his arrest.[3/]

5.    On or about August 5, 2009, law enforcement agents acting pursuant to a court-authorized wiretap intercepted a call between Spatafora and the defendant.[4/]  The following is an excerpt from the call:

> SPATAFORA:    What do you figure for seven, if I had?
> 'Cause my friend's gotta, my
> friend's gotta work something out.  He
> wants to see something the other way,
> you understand what I'm talking about?
>
> CAMPBELL:     OK I understand, yeah.
>
> SPATAFORA:    'Cause he's got two clients, different
> people, you know what I'm saying?
>
> CAMPBELL:     OK, so I'll have something else with me
> too.
>
> SPATAFORA:    Huh?
>
> CAMPBELL:     Yeah, I can do that.  I understand what
> you're saying.  I'll . . .
>
> SPATAFORA:    He's got to see it the other way.  If
> it's good, then he'll stick with you.
> But you gotta give me a price on seven.

---

[3]    At the time of his arrest, CAMPBELL told the undersigned that the CELL PHONE belonged to him and provided the telephone number 631-478-2453, which is same number used by CAMPBELL during the intercepted calls.

[4]    The call was intercepted on (516) 903-2345, a phone registered to Rob's Pro Towing Inc., and used by Robert Spatafora, from (631) 478-2453, a phone registered to the defendant.  The caller identified himself as "Drew" and addressed the other individual as "Rob."

CAMPBELL:      OK, sounds good.  I'll see you there
               then.

SPATAFORA:     No, you gotta give me a price.

CAMPBELL:      Oh right now?  Uh, just uh, I would say,
               like, the other way, for the ... like
               850.

SPATAFORA:     For seven?

CAMPBELL:      Oh for seven.  No whatever it would be
               then.

SPATAFORA:     No, he wants to take it your way and go
               the other way to make sure it's fuckin'
               good.  And then he's going to stick with
               you, you understand?

CAMPBELL:      OK, you're talking about the guy who
               called me yesterday, right?

SPATAFORA:     No.  Someone totally different.

CAMPBELL:      So, uh, for seven, I'm sorry...

SPATAFORA:     Just listen.  He takes it your way, he
               tried it that way.  Now he wants to do
               it the other way, you understand what
               I'm saying?  And if it's good he's
               going to stick with you.

CAMPBELL:      Alright, so he wants a price for seven?

SPATAFORA:     Yeah, right now.

CAMPBELL:      Alright, what did I say then? [UI]  I'm
               sorry . . . [UI] real quick.  Uh, three
               and a quarter.

SPATAFORA:     How much?

CAMPBELL:      Three and a quarter.

SPATAFORA:     Alright, I'll call you in a little while
               or I'll let you know by later.  If I get
               busy, just call busy, 'cause I'm going
               crazy right now, alright?

5

6. Based upon my training and experience, which includes the investigation of narcotics trafficking, and on conversations with other law enforcement agents who are also involved in investigating drug crimes, including the distribution of cocaine, I believe that the conversation between Spatafora and the defendant concerned a transaction for seven grams of cocaine, which the defendant offered to sell to Spatafora's friend for $325. I further believe that in this conversation, Spatafora's statement "he wants to take it your way and go the other way to make sure it's fuckin' good," was intended to inform the defendant that Spatafora's friend wished to cook the cocaine into crack, in order to test the quality of the cocaine the defendant was selling.

7. In two subsequent phone calls on August 5, 2009, the defendant informed Spatafora that he was on his way to meet with Spatafora.

8. At or about 5:30 p.m. on August 5, 2009, law enforcement agents observed CAMPBELL arrive at Spatafora's automotive repair shop in Ronkonkoma, New York.

9. On September 9, 2009, law enforcement agents intercepted the following call between Spatafora and the defendant:

SPATAFORA: I'm just fuckin' tellin' you, you're getting a lot of complaints again. I'm just telling you, so you can do the right thing.

CAMPBELL:       Alright, from uh, from . . .

SPATAFORA:      From the people that see him.

CAMPBELL:       From which kid, which one?

SPATAFORA:      The black guy.

CAMPBELL:       Alright.  Alright, 'cause he had said
                something to me and I thought everything
                was alright since then.

SPATAFORA:      No.  'Cause fuckin' the people . . . I
                see the people he talks to, so they told
                me direct.  Whatever, I don't want to
                see you fuck up again, you know?

CAMPBELL:       No, no.  Alright, yeah, I'll talk to my
                friend right now.

SPATAFORA:      Alright, I just wanted to let you know,
                alright?

CAMPBELL:       Thanks again.

        10.   Based upon my participation in this investigation,
I believe that the September 9 conversation between Spatafora and
the defendant concerned complaints that Spatafora was relaying to
the defendant about the quality of the cocaine the defendant had
sold to SPATAFORA's friend, and which that friend subsequently
sold to other associates of Spatafora.

        11.   Based upon information provided by the CW, the
defendant used the CELL PHONE to arrange cocaine transactions as
recently as late January 2010.

        12.   On August 30, 2010, the Honorable Lois Bloom
authorized an arrest warrant for DREW CAMPBELL.  CAMPBELL was

                                7

arrested that night, and the CELL PHONE was recovered from his person. On August 31, 2010, CAMPBELL was released on bond.

13. At the time of his arrest, CAMBPELL was in possession of approximately one gram of a substance that field-tested positive for cocaine.

14. As set forth above, CAMPBELL used the CELL PHONE to discuss his cocaine transactions. Moreover, CW has reported that he has observed CAMPBELL engage in discussions with Spatafora and others on the CELL PHONE, and that shortly after completing those discussions, CAMPBELL has proceeded to meet with individuals to whom he sells cocaine. Based upon my training and experience and on my conversations with law enforcement agents who have experience investigating narcotics trafficking, it is my understanding that individuals who use their cell phones to conduct their narcotics business usually store the names, addresses and telephone numbers of other individuals involved in narcotics trafficking, such as their customers and suppliers. It is also my experience that individuals involved in narcotics trafficking also use other features of their cell phones, such as the calendar and task features, to make notes or keep records relating to narcotics transactions.

15. CW has also reported that CAMPBELL uses his CELL PHONE to send text messages to other individuals involved in

8

narcotics trafficking.  Based on my training and experience, and
my conversations with other law enforcement agents involved in
investigating narcotics trafficking, it is my understanding that
individuals involved in drug sales often use the text message
feature of their cell phones to communicate with buyers and
suppliers in order to coordinate meetings, purchases and sales.

        16.  In light of the facts described above
demonstrating that CAMPBELL uses the CELL PHONE to conduct his
cocaine business, I submit that there is probable cause to
believe that the CELL PHONE, which has not been searched,
contains stored text messages as well as information such as the
names, addresses and telephone numbers of individuals involved in
the criminal activities engaged in by the defendant and others.

        WHEREFORE, I respectfully request that a search warrant
be issued for the CELL PHONE to search and to seize text
messages, names, telephone numbers, calendar entries, electronic
serial numbers, international mobile subscriber numbers and other
related information concerning the conspiracy to distribute more

than 500 grams of cocaine, which may constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 846.

JAMES G. LEE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
_13_ Day of September, 2010